IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 16–cv–01914–KMT

HENRY A. HURST III,
SUSAN I. HEATH, as Co-Personal Representatives of the Estate of NATALEE MARIE
SKINNER-HURST, deceased, and
JONATHAN ROBERTS HURST, individually,

      Plaintiffs,

v.

ROTCHANA S. MADERA,
SUZANNE DOLAN,
HCA-HEALTHONE LLC, a limited liability company doing business as SWEDISH MEDICAL
CENTER,
ROCKY MOUNTAIN HOSPITAL FOR CHILDREN AT SWEDISH MEDICAL
CENTER,
JO A. WACKER-FARRAND,
MARGARET HAUSER, and
JANE GALLUP,

      Defendants.

---

**ORDER**

---

This matter is before the court on the "Motion to Dismiss Defendants HCA-Healthone

LLC, Jo Ann Wacker-Farrand, Margaret Hauser and Jane Gallup." (Doc. No. 62 ["Mot."].)

Plaintiff filed a Response (Doc. No. 88), to which Defendants filed a Reply. (Doc. No. 89

["Reply"].)[1]

---

[1] For the sake of brevity, although there are additional defendants in this matter, the four
defendants who filed the present motion are collectively referred to herein as "Defendants."

**Background Information**

Kelsy Newell-Skinner gave birth to Natalee Marie Skinner-Hurst on May 14, 2014. (Doc. No. 50 at 7 ["Am. Comp."].)[2] On that same date or the next day, an employee(s) of Defendant HCA-Healthone LLC, a limited liability company doing business as Swedish Medical Center ("SMC"), reported to Colorado Protective Services of the Denver County Department of Human Services ("DCDHS") that Baby Natalee was born prematurely, her mother had admitted to marijuana use during the pregnancy, and the mother had also tested positive for marijuana. (*Id.* at 8, 115.) DCDHS' records indicate Defendant Jo A. Wacker-Farrand, an SMC social worker, made the report indicating that in addition to the mother's marijuana use, the primary concern was neglect, with other complicating factors of stress in the home, explained as circumstances that create risk to child safety, and that the baby's urine did not test positive but a Meconium test had been requested. (*Id.* at 8.) SMC's records indicate that Defendant Margaret Hauser, another SMC social worker, informed Baby Natalee's mother and father, Jonathan Hurst, of the report to DCDHS and that the father was upset about it. (*Id.* at 115.)

Baby Natalee and her mother were discharged on May 23, 2014. (*Id.* at 9.) The results of the Meconium test were returned on May 27, 2014 and were positive for tetrahydrocannabinol ("THC"), a chemical contained in marijuana. (*Id.*)

Plaintiffs allege that during Baby Natalee's hospitalization and afterward, various family members and other interested persons reached out with multiple pleas, inquiries and requests to

---

[2] Since the filing of the current motion, Plaintiffs filed a Second Amended Complaint. (Doc. No. 94.) However, the amendments contained therein pertain only to allegations and claims against Defendant Suzanne Dolan. Therefore, this Order will reference Plaintiffs' Amended Complaint (Doc. No. 50) as it is the pleading upon which the current motion is based and to which the briefing refers.

SMC's employees, including Defendants Wacker-Farrand, Hauser, and Jane Gallup to inquire why there were no caseworkers/social workers from DCDHS and SMC showing up to render services and investigate. (*Id.* at 66.) They also reported the baby's mother had not bonded with her, the mother had stated that the baby did not like her, and the mother suffered from pre-existing mental health and substance abuse issues. (*Id.* at 66-67.) Defendant Rotchana Madera, the assigned DCDHS caseworker, reported to DCDHS that she visited Baby Natalee in the hospital after her birth, the Meconium test was negative, and that she had performed a home visit after Natalee was released and interviewed both parents. (*Id.* at 10-18.) Each of these reports was false as the Meconium test was positive and Defendant Madera never contacted anyone in Baby Natalee's family, nor did she visit the baby in the hospital or at home after the baby's release. (*Id.*) Additionally, DCDHS records show Defendant Madera accessed Natalee's case file on May 19, 2014 and May 27, 2014, the date of the positive Meconium test results. (*Id.* at 13-14.) She did not access it again until July 8, 2014, at which point she recommended the case be closed. (*Id.* at 14.) [3]

On July 31, 2014, Baby Natalee died after being injured by her mother on July 27, 2014. (*Id.* at 67-68.) Plaintiffs have asserted a claim of Professional Negligence Resulting in Wrongful Death against Defendants SCM, Wacker-Farrand, Hauser, and Gallup. (*Id.* at 106-139.) Defendants seek dismissal arguing that they complied with their legal duties and therefore, Plaintiffs cannot state a viable negligence claim.

---

[3] DCDHS records include additional false reports pertaining to Defendant Madera's contact with Baby Natalee and her mother. Because those facts are not relevant to the issues presented in the current motion, the court will not address them herein.

**Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff."  *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory.  *Id*. at 679-81.  Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id*. at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id*. at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments.  *S. Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quotations omitted).

## Analysis

Plaintiffs base their professional negligence claim upon what they describe as "a set of complex acts of misfeasance and nonfeasance" by Defendants. (Resp. at 13.) "In determining whether a defendant owes a duty to a particular plaintiff, the law distinguishes between acting and failure to act, that is, misfeasance, which is active misconduct that injures others, and nonfeasance, which is a failure to take positive steps to protect others from harm." *Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002) (citing *Univ. of Denver v. Whitlock*, 744 P.2d 54 (Colo. 1987)). According to Plaintiffs, Defendants had statutory duties to take certain actions

based upon misfeasance.  Additionally, Plaintiffs argue that had statutory duties not applied, Defendants had a special relationship with Baby Natalee and her mother and therefore, owed a duty of care based upon nonfeasance.

### a.  Duty to Act

"In Colorado, a prima facie case of negligence is established when the plaintiff proves the following elements: the existence of a legal duty owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a causal relationship between the breach and the injury." *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929 (Colo. 1997) (citing *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992)).  "Because negligence requires proof of the existence and breach of a legal duty, a negligence claim cannot be sustained without evidence of an applicable standard of care and evidence that the defendant's conduct did not conform to the standard of care."  *Gerrity,* 946 P.2d at 929 (citing *United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992)).  In *Gerrity*, the court discussed situations in which legislative enactments and/or administrative regulations establish the applicable standard of care.  *Id.*  "If the legislative enactment or regulation defines the legal duty owed by the defendant, then proof of its violation establishes a breach of that duty."  *Id.*

Plaintiffs reference various Colorado statutes throughout their Amended Complaint and Response in an attempt to identify a statute defining a legal duty on the part of Defendants that they allege Defendants breached.  Looking at each of the referenced statutes in turn, however, Defendants' actions, as alleged in the Amended Complaint, did not violate any applicable legal obligation.

6

Plaintiffs cite to Colo. Rev. Stat. § 19-3-304, which requires Defendants to report a "child being subjected to circumstances or conditions that would reasonably result in abuse or neglect." It is undisputed Defendants complied with this statutory obligation by reporting their concerns regarding Baby Natalee to DCDHS, specifically stating that their primary concern was neglect and that the baby's mother had admitted to marijuana use and tested positive to THC. (Am. Comp. at 8, 115.)

Plaintiffs concede Defendants made a report pursuant to Colo. Rev. Stat. § 19-3-304 but argue Defendants failed to accurately assess factors of risk and endangerment, perform an "ongoing assessment" of needs or barriers to services upon discharge, refer the mother for substance abuse, alcohol education, or treatment, or create a plan of care that would ensure the continuation of services and support to meet the needs of the baby and her caregivers. (Resp. at 8-9.) In their Amended Complaint and Response, Plaintiffs assert conclusory statements that the described actions were required. (*Id.*; Am. Comp. at 114, 117, 119-20.) However, Plaintiffs do not cite to any statute or regulation mandating these actions.

Relying on Colo. Rev. Stat. § 25-1-122(4)(d), Plaintiffs also assert that Defendants were required to make additional reports to DCDHS that family members reached out expressing additional concerns post-discharge and inquire as to why DCDHS was not rendering social services or investigating. (Resp. at 10-13; Am. Comp. at 126-27.) However, Colo. Rev. Stat. § 25-1-122(4) provides only that certain health related records and their content will be held as confidential. Sub-section (4)(d) of that statute provides an exception for reports of child abuse. Thus, this statute does not establish a legal duty nor in any other way require the actions Plaintiffs describe in their Amended Complaint and Response.

Relying on Colo. Rev. Stat. §§ 19-3-401 and 19-3-405, Plaintiffs state Defendants were obligated by law to cause to have Baby Natalee taken into protective custody. (Resp. at 12; Am. Comp. at 70.) Colo. Rev. Stat. § 19-3-401 provides authority to law enforcement officers to take children into protective custody under certain circumstances. Though not specifically identified by Plaintiffs, 19-3-401(3)(c)(1) allows a law enforcement officer to take a newborn, defined as less than 72 hours old, into protective custody when a "physician, registered nurse, licensed practical nurse, or physician assistant" identifies the newborn "as being affected by substance abuse or demonstrating withdrawal symptoms." As Defendants point out, under the plain language of this section, law enforcement officials could have taken temporary custody of Baby Natalee when Defendants reported to DCDHS that the mother had a positive drug test, however, this statute does not impose a duty on or provide authority for Defendants, as hospital employees, to take custody and control of Baby Natalee.

Finally, Plaintiffs state that Colo. Rev. Stat. § 19-3-405 required SMC's hospital administrator to cause Baby Natalee to be taken into temporary protective custody. (Resp. at 5.) Plaintiffs misread this statute. Colo. Rev. Stat. 19-1-103(1)(a)(VII) defines child abuse or neglect as including any case in which a child tests positive at birth for various schedule 1 controlled substances, including marijuana. Colo. Rev. Stat. § 19-3-405(2)(a) states that a hospital administrator may, but is not required to, seek a temporary protective custody order if a child reasonably believed to have been neglected or abused is being treated.[4]

---

[4] Plaintiffs also cite to Colo. Rev. Stat. § 19-1-103(20) and Colo. Rev. Stat. § 19-10-107 as establishing a legal duty on the part of Defendants. (Resp. at 13; Am. Comp. at 128.) However, Colo. Rev. Stat. § 19-1-103(20), at all times relevant to the present lawsuit, defines the term 'child care centers' and § 19-10-107 was repealed in 1987. *See* Act of July 1, 1987, ch. 138, 1987 Colo. Sess. Laws 1st Reg. Sess. 695.

In order for Plaintiffs' claim to survive a request for dismissal, they must sufficiently allege Defendants not only owed a legal duty to Baby Natalee and/or her mother, but also breached that duty. *Gerrity,* 946 P.2d at 929. The statutes upon which Plaintiffs rely establish only that Defendants had a duty to report to DCDHS their concerns that Baby Natalee would be subject to neglect and that the baby and the mother tested positive for marijuana use. *See* Colo. Rev. Stat. § 19-3-304. Plaintiffs concede Defendants complied with this requirement.

### b. Special Relationship

Plaintiffs contend that even if Defendants did not have a legal duty to act pursuant to statute or regulation, they had a special relationship with Baby Natalee and her mother making them responsible for preventing the type of harm that occurred in this case. As noted, courts recognize this type of claim as nonfeasance negligence, which "involves passive inaction or a failure to take steps to protect someone from harm." *State Farm Fire & Cas. Co., Inc. v. U.S.*, No. 06-cv-01135-WYD-MJW, 2008 WL 5083502, at *9 (D. Colo. Nov. 25, 2008).

> In nonfeasance cases a duty has been recognized only in a limited group of cases where a special relationship existed between the parties of such a character that social policy justified the imposition of a duty to act. Special relationships that have been recognized include common carrier/passenger, innkeeper/guest, possessor of land/invited entrant, employer/employee, parent/child and hospital/patient.

*Id.* (citing *Whitlock*, 744 P.2d at 57–58).

Colorado law's recognition of a special relationship is limited. "[B]ecause in misfeasance the actor has created a new risk, and in nonfeasance the actor has simply preserved the status quo, the situations in which nonfeasance leads to liability are more circumscribed than those for misfeasance." *Smit*, 72 P.3d at 372.

9

> In Colorado, absent a special relationship, a person generally has no duty to take action for the protection of another even if it is reasonably apparent that such action is necessary to protect the other person from injury or peril. Special relationships typically involve circumstances in which the defendant either had a treating or supervisory relationship with the decedent or maintained custodial control over the decedent's environment.

*Watkins v. Action Care Ambulance, Inc.*, No. 07–cv–02598–WJM–BNB, 2011 WL 108527, at *4 (D. Colo. March 23, 2011) (quoting *English v. Griffith*, 99 P.3d 90, 94 (Colo. App. 2004)). While patient Kelsy Newell-Skinner and patient Baby Natalee were in the hospital, a special relationship existed between both of the two and their medical caregivers. However, that relationship did not continue after mother and baby's discharge from the hospital.

Citing *Leake v. Cain*, 720 P.2d 152 (Colo. 1986), Plaintiffs assert a conclusory statement in their Response that "there is no question here that a 'special relationship' existed by and between [] Defendants and patient Kelsy Newell-Skinner and by and between [] Defendants and patient Baby Natalee who was birthed at SMC." (Resp. at 15.) However, *Leake* does not support Plaintiffs' conclusion. In *Leake*, police officers were summoned to a party of teenagers where alcoholic beverages were being served. *Id.* at 160-61. Ralph Crowe, one of the intoxicated attendees, attempted to interfere with the officers' efforts to disperse the group, resulting in the officers handcuffing him. *Id.* at 161. Eventually, the officers released Ralph Crowe to his younger brother, Eddie Crowe, who appeared sober, to drive him home. *Id.* After leaving the party, the brothers stopped at a store and when they left, Ralph drove the car instead. *Id.* at 154. Ralph struck six people on the street, killing two of them. *Id.* The decedents' families filed a wrongful death action, asserting claims against the officers who released Ralph Crowe for negligently failing to take him into custody, arguing that it was foreseeable he would drive an automobile and injure the public. *Id.*

10

The court ruled in favor of the officers, explaining, "While the officers obviously had a duty to prevent Ralph Crowe from harming others while he was handcuffed at the party, *see* Restatement (Second) of Torts § 319 (1965) (duty of those in charge of person having dangerous propensities), the officers discharged their duty by restraining Crowe until he calmed down. The officers' duty, as it related to the conduct of Ralph Crowe, began and ended at the party. It did not extend to the period after Ralph Crowe was released to his younger brother, who assured the officers that he would drive Ralph Crowe home." *Id.* Thus, the *Leake* decision does not support a finding Defendants had a special relationship with either Baby Natalee or her mother following their discharge.

Plaintiffs also attempt to rely on *Perreira v. State*, 768 P.2d 1198 (Colo. 1989) wherein a court held a mental hospital could be liable for the shooting death of a police officer by a mentally ill person recently released from an involuntary commitment for short-term treatment. Plaintiffs' reliance on the *Perriera* decision is misplaced. In reaching its holding, the court in *Perreira* focused on the unique relationship between a treating psychiatrist and an involuntarily, as opposed to voluntarily, committed patient. *Id.* at 1216. "The involuntary commitment of a mentally ill person to a state mental health facility creates a special relationship substantially different in kind from the relationship existing between a treating psychiatrist and a voluntary patient." *Id.* The differences in the relationship, as the court noted, were the responsibility and duties Colorado statutes applied to a psychiatrist treating an involuntarily committed patient. *Id.* Colorado law provided that the treating psychiatrist could deny various rights otherwise granted to mentally ill persons under commitment, terminate treatment and discharge the patient, seek a court order extending the term of the patient's treatment for three months, petition the court for

11

long-term care and treatment if the patient's mental illness rendered him a danger to himself or others, and petition the court for an order depriving the patient of certain rights upon his release in the interest of public safety. *Id.* (citing Colo. Rev. Stat. §§ 27–10–108, 27–10–109(1), 27–10–110(1), § 27–10–125). Based on the extent of the treating psychiatrist's control over the conditions and duration of the patient's involuntary commitment, the court rejected the psychiatrists' contention that they had no actionable duty to protect members of the public from the released patient. *Id.*

As established in the previous section, Colorado law did not provide Defendants control or custody of Baby Natalee or her mother, and certainly not to the extent that resulted in finding a duty to protect third parties from harm, as in *Perreira*. Further, Plaintiffs' position that Defendants had a special relationship with individuals months after they were released from Defendants' care is untenable. Baby Natalee and her mother were released on May 23, 2014. Baby Natalee's injury and subsequent death did not occur for over two months following their release. Plaintiffs have not cited to any case law in which a court has held a medical hospital responsible for a medical patient's actions months after her release. Defendants argue that a hospital providing maternity services cannot be expected to assume the duty of monitoring families, predicting future child abuse, and intervening in custody issues. The court agrees. Similar to *Leake*, to the extent Defendants' had a special relationship with Baby Natalee and her mother to prevent harm, that relationship existed while they were in Defendants' care. *Id.* at 161. There are no allegations Baby Natalee was in any way abused, neglected, or otherwise harmed while in Defendants' care.

Therefore, it is

**ORDERED** that the "Motion to Dismiss Defendants HCA-Healthone LLC, Jo Ann Wacker-Farrand, Margaret Hauser and Jane Gallup" (Doc. No. 62) is **GRANTED in its entirety**. Defendants HCA-Healthone LLC, a limited liability company doing business as Swedish Medical Center, Jo Ann Wacker-Farrand, Margaret Hauser and Jane Gallup are dismissed from this action.

Dated this 27th day of September, 2017.

BY THE COURT:

Kathleen M Tafoya
United States Magistrate Judge