IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 16–cv–01914–KMT

HENRY A. HURST III,
SUSAN I. HEATH, as Co-Personal Representatives of the Estate of NATALEE MARIE
SKINNER-HURST, deceased, and
JONATHAN ROBERTS HURST, individually,

      Plaintiffs,

v.

ROTCHANA S. MADERA and
SUZANNE DOLAN,

      Defendants.

---

## ORDER

---

      This matter is before the court on "Defendant Dolan's Motion to Dismiss Pursuant to

Fed. R. Civ. P. 12(b)(6)." (Doc. No. 66.) Following Plaintiffs' Amended Complaint, Defendant

filed a "Supplement to Her Motion to Dismiss [ECF DOC #66]" (Doc. No. 95.) Plaintiffs filed a

Response (Doc. No. 100), to which Defendant replied. (Doc. No. 101.)

## BACKGROUND INFORMATION

      Kelsy Newell-Skinner gave birth to Natalee Marie Skinner-Hurst on May 14, 2014.

(Doc. No. 94 at 7-8 ["Am. Comp."].) On that same date or the next day, an employee(s) of

Swedish Medical Center ("SMC") reported to Colorado Protective Services of the Denver

County Department of Human Services ("DDHS") that Natalee was born prematurely, that her

mother had admitted to marijuana use during the pregnancy, and the mother had also tested

positive for marijuana.  (*Id.* at 8.)  DDHS notes indicate Jo A. Wacker-Farrand, an SMC social

worker, made the report indicating that in addition to the mother's marijuana use, Wacker-

Farrand's primary concern was neglect, with other complicating factors of stress in the home

explained as circumstances that create risk to child safety, and that the baby's urine did not test

positive for controlled substances but a Meconium test had been requested.  (*Id.* at 8-9.)  Natalee

was discharged with her mother on May 23, 2014, prior to receipt of the Meconium test.  (*Id.* at

10.)  The Meconium test results were received on May 27, 2014 and were positive for

tetrahydrocannabinol ("THC"), a chemical commonly contained in marijuana.  (*Id.*)

DDHS assigns cases to its case workers on a rotating basis.  (*Id.* at 82.)  Thus, when  a

new case file is opened, it is randomly assigned to the case worker up next in rotation.  (*Id.*)

Following Wacker-Farrand's report, Natalee's case was randomly assigned to DDHS case

worker, Defendant Rotchana Madera, on May 16, 2014.  (*Id.* at 9.)

Defendant Madera had begun working as a social case worker for DDHS in May 2013.

(*Id.* at 48.)  From May 2013 until October 2013, Defendant Madera's supervisor engaged her in

weekly training/meetings regarding her assigned cases.  (*Id.*)  After October 2013, the

training/meetings occurred bi-weekly.  (*Id.*)

Defendant Suzanne Dolan was promoted to Social Casework Supervisor in April 2014.

(*Id.* at 10, 20-21.)  At that time, she supervised seven social case workers, including Defendant

Madera.  (*Id.*)  As her supervisor, Defendant Dolan was responsible for the oversight, evaluation,

and standards of performance for Defendant Madera.  (*Id.*)  Following her promotion and

consistent with DDHS policy, Defendant Dolan also continued to carry and engage in her full

case load functions and work she had been performing for one year as the Lead Intake Social

Caseworker on a different team at DDHS.  (*Id.* at 47, 51-52.)  In contrast with Defendant

Madera's previous supervisor, Defendant Dolan held only approximately two training/meetings

with Defendant Madera between May 2014 and July 2014.  (*Id.* at 48-49.)  Additionally, during

those meetings, it was apparent Defendant Dolan was not very knowledgeable about Defendant

Madera's case files.  (*Id.*)  Defendant Dolan would inform Defendant Madera that she had a

caseload of her own and would not answer Defendant Madera's questions regarding her

expectations.  (*Id.* at 49.)

At the time Natalee's case was assigned, Defendant Dolan was aware Defendant Madera

had 25 cases, more than twice the case load of other case workers.  (*Id.* at 25, 82.)  Defendant

Madera's case load should have included only 10-15 cases.  (*Id.* at 25, 49.)  Defendant Dolan

was also aware Defendant Madera had been removed from the "on-call" caseworker rotation in

April 2014 due to an excessive caseload.  (*Id.* at 26, 49.)  Defendant Dolan placed Defendant

Madera back on the on-call caseworker rotation in May 2014.  (*Id.*)

Defendant Dolan knew that people could not find Defendant Madera during the day when

she was supposed to be working on her cases and knew Defendant Madera was behind other case

workers in her unit in closing cases.  (*Id.* at 26-27.)  At some point, Defendant Madera requested

Defendant Dolan relieve her of some of her cases but Defendant Dolan refused, responding,

"We're all busy.  We have to suck it up."  (*Id.* at 28-29, 50.)  Defendant Madera specifically

asked Defendant Dolan to remove her from Natalee's case file but Defendant Dolan refused.  (*Id.*

at 71, 83.)

As Defendant Dolan was aware, at or near the time period in which Defendant Madera

was assigned to Natalee's case, Defendant Madera had been the case worker on a case involving

infant death.  (*Id.* at 32.)  As Defendant Dolan should have been aware, Defendant Madera was

exhibiting psychological and/or physical nervousness, stress, duress, sadness, inability to cope,

anxiety, and/or a breakdown relative to her job duties.  (*Id.*)

DDHS administers a statewide, automated database system known as TRAILS that, *inter*

*alia*, tracks children/youth alleged to have been abused and/or neglected, as well as the protective

services delivered to them by each county in Colorado.  (*Id.* at 8, 34.)  The TRAILS report

showed that there were 21 child welfare reports regarding Kelsy Newell-Skinner prior to

Natalee's birth.  (*Id.* at 8-9.)  Additionally, a report was made on June 3, 2014, after Natalee was

home with Kelsy Newell Skinner, to the Arapahoe County Department of Human Services that

Kelsy Newell-Skinner had slammed her two-year-old's head into the bath tub.  (*Id.* at 36.)

Defendant Madera noted in her TRAILS report that she visited Natalee and her mother at

SMC on two occasions prior to their discharge.  (*Id.* at 11-12, 16-17.)  However, in reality,

Defendant Madera never visited Natalee or her mother at SMC.  (*Id.*)  The TRAILS report also

indicates Defendant Madera received a voicemail from a SMC employee that Natalee's

Meconium test results were negative for "all substances."  (*Id.* at 12, 16, 18.)  However, SMC

staff never left such a message and the employee Defendant Madera specified was out of town at

the time Defendant Madera documented the call.  (*Id.* at 12-13, 16.)  Moreover, as previously

noted, Natalee's Meconium test was positive for THC.  (*Id.* at 10.)  Defendant Madera also

recorded in TRAILS that she had visited the home of Natalee and her mother, had observed and

interviewed all children in the home, and interviewed each of Natalee's parents.  (*Id.* at 13, 17-

19.)  However, Defendant Madera never visited Natalee's home, never met the other children in

the home, and never interviewed Natalee's parents.  (*Id.* at 13.)

On July 8, 2014, Defendant Madera recommended to Defendant Dolan that they close Natalee's file. (*Id.* at 19.) In reviewing the file, Defendant Dolan noticed it did not contain any interview notes with Natalee's mother or father, as required. (*Id.* at 19-20.) She informed Defendant Madera that she could not close the case file and instructed her to conduct the required interviews and update the report. (*Id.* at 44-45.) By reviewing the file, Defendant Dolan would have been aware of the complete file history of Natalee's mother. (*Id.* at 38-39.) Plaintiffs contend Defendant Dolan should have at that point, if not sooner, known that Natalee was in a high risk household. (*Id.* at 37, 76-77.) They also contend she should have been spot-checking Defendant Madera's work by independently calling or visiting Natalee's home, calling and/or meeting with witnesses and other family members to elicit feedback about services being provided. (*Id.*)

Additionally, Defendant Madera's required documentation assessing the risk factors in Natalee's home contained fraudulent errors. (*Id.* at 41.) The level of risk assessed on the documentation determines the appropriate level of response by the case worker. (*Id.* at 42.) Plaintiffs contend that had Defendant Madera completed the documentation correctly, the Newell-Skinner household would have been considered High Risk, rather than Moderate Risk, and would have resulted in assignment to a team specifically designed for High Risk files and, ultimately, Natalee's removal from the home. (*Id.* at 42-43, 74-75, 82, 90.)

On July 27, 2014, Natalee was severely injured by her mother and died four days later on July 31, 2014. (*Id.* at 20.) Following Natalee's death and Defendant Madera's resignation from DDHS on July 31, 2014, Defendant Dolan accessed Natalee's TRAILS file and made her own false notations regarding previous work done in the file. (*Id.* at 36-37, 79-81.) A subsequent

investigation conducted by the OCCPO concluded the actions and inactions of the DDHS were not in compliance with multiple policies and regulations and these failures had a potential impact on not only Natalee's safety and wellbeing but also the other children in the Newell-Skinner household.  (*Id.* at 46-47.)

 By this lawsuit, Plaintiffs have asserted three claims under 42 U.S.C. § 1983 against Defendant Dolan alleging she violated Natalee's rights to substantive due process under the Fourteenth Amendment based on deliberately indifferent training and supervision of Defendant Madera.  (*Id.* at 105-121.)  They also assert a due process claim relying on the "danger-creation theory," which essentially provides limited circumstances wherein state officials can be liable for the acts of third parties if those officials created the danger that caused the harm.  (*Id.* at 97-105.) Finally, Plaintiffs assert a state law claim alleging willful and wanton conduct on the part of Defendant Dolan resulting in wrongful death.  (*Id.* at 121-27.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotations omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff."  *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The *Iqbal* evaluation requires two prongs of analysis.  First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 679-81.  Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678.  Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by

reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quotations omitted).

## ANALYSIS

Defendant Dolan has requested dismissal of Plaintiffs' federal claims on the basis of qualified immunity. Qualified immunity generally protects government officials from lawsuits unless they are "plainly incompetent" or they "knowingly violate the law." Once a defendant asserts a defense of qualified immunity, the burden is on the plaintiff to establish two propositions: (1) "that the defendant's actions violated a constitutional or statutory right," and (2) that the right was "clearly established" when the defendant acted. *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (quotations omitted). Failure to establish either one requires the court to grant judgment to the defendant. *See id.* In the present case, the court can begin, and perhaps end, its inquiry by addressing either proposition. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As set forth below, the court finds Plaintiffs have failed to sufficiently allege a constitutional violation and that, even if Plaintiffs had sufficiently alleged the same, their theory of liability was not clearly established.

## 1.  Failure to Train

Plaintiffs assert Defendant Dolan violated Natalee's right to substantive due process under the Fourteenth Amendment based on her failure to adequately train Defendant Madera. (Am. Comp. at 105-21.) Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the

United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." The inadequacy of training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons affected. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Additionally, personal participation is an essential element in a civil rights action. *See Ky. v. Graham*, 473 U.S. 159, 166 (1985). In this vein, a supervisor can only be held liable for his or her own deliberate intentional acts. *See Iqbal*, 556 U.S. at 676; *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("[Section] 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation.").

Prior to *Iqbal*, the law was generally well established that a supervisor could be held personally liable for failing to train subordinate employees if the failure to train rose to the level of deliberate indifference. *City of Canton*, 489 U.S. at 388-89. The Tenth Circuit has "not determined whether a failure to train satisfies the [generally stricter] post-*Iqbal* personal-involvement requirement . . . ." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016). In *Keith*, the court concluded it need not reach the question because it determined the plaintiff's allegations were insufficient under the more lenient pre-*Iqbal* standard for supervisory liability. Similarly, in this case, presuming without deciding that a failure to train claim survives post-*Iqbal*, the court concludes Plaintiffs' allegations are insufficient to establish such a claim.

Under a failure to train claim, a plaintiff must ordinarily show a defendant had "actual or constructive notice that a particular omission in [a training] program cause[d officials] to violate citizens' constitutional rights" and nonetheless "made a conscious choice to retain [the] deficient

training program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Plaintiffs do not allege any such notice or particular omission. Instead, they claim their allegations show that a "violation of federal rights [was] a 'highly predictable' or 'plainly obvious' consequence" of Defendant Dolan's substandard training of Defendant Madera. *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). Such proof is only possible in a "narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. Moreover, if the proper behavior is obvious without any training, the failure to train does not support a finding of deliberate indifference. *See Keith*, 843 F.3d at 839.

In *City of Canton*, the Supreme Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Id.* at 390 n.10. In its hypothetical, the Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations. *Connick*, 563 U.S. at 64 (citing *City of Canton* at 390 n.10). As the Court observed, this hypothetical recognizes that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force." *Id.*

In asserting a failure to train claim in *Keith*, the plaintiff , who claimed she was raped by a prison maintenance instructor, relied on an audit report that concluded the prison facility "failed to provide targeted training" relating to unique issues arising in a female-only facility.

The court held, "Even if the Audit Report creates a dispute about the extent of training provided to TCF employees, it does not provide a basis from which a jury could find 'essentially a complete failure to train' that made sexual misconduct 'almost inevitable.'" *Id.* at 839 (quoting *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991)). *See also Flores v. County of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) (affirming district court's dismissal of failure to train claim where the plaintiff alleged sexual assault by deputy sheriff and court concluded sexual assault is not something reasonable employees need to be trained not to do, stating, "If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that [] specific [training] not to commit sexual assault will provide such deterrence, and therefore failure to include such instruction does not constitute deliberate indifference absent a longstanding pattern of such criminal behavior."); *Sierra v. Dep't of Family and Children Servs.*, No. CV 15-03691-DMG (KES), 2016 WL 3751954, at *10 (C.D. Cal. Feb. 16, 2016) ("Any allegation that the County failed to train social workers not to offer[] perjured testimony at dependency hearings would fail for the same reasons set forth in *Flores*, because perjury is already a crime.").

In the present case, Plaintiffs allege no pattern of constitutional violations by untrained employees. Instead, they complain generally that Defendant Dolan did not provide as much training as Defendant Madera's previous supervisor. (Am. Comp. at 47-49, 51-52.) They indicate that Defendant Madera met with her previous supervisor weekly on new cases and then bi-weekly, *see id.*, while Defendant Madera only met with Defendant Dolan a total of two to three times on her cases between May 2014 and July 2014. (*Id.*) Yet, there is every reason to assume that case workers, such as Defendant Madera, were not going to falsify their records

regarding their work on a case.  As Plaintiffs note, falsifying records within the TRAILS system is a criminal act and "everyone is presumed to know the law."  *Flores,* 758 F.3d at 1160. Moreover, presuming Defendant Madera's action did not constitute criminal behavior, it is not so "patently obvious" that Defendant Dolan's alleged failure to adequately train would have resulted in Defendant Madera simply fabricating work, including interviews and home visits, that never took place.  Consequently, Plaintiffs have made no showing that Defendant Dolan's alleged failure to train Defendant Madera falls within the narrow range of circumstances such that a pattern of constitutional violations is not required.

**2. Due Process Claim: State Created Danger**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause does not establish a general protection from harm or violence by third parties.  *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 199–200 (1989).  However, there are two exceptions to this general principle: (1) the special relationship doctrine and (2) the danger-creation theory.  *See Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).  Plaintiffs' claim relies on the latter, the danger-creation theory.  (Am. Comp. at 97-104.)[1]

Pursuant to the danger creation exception, "a state official may be liable when 'a state actor affirmatively acts to create, or increase[ ] a plaintiff's vulnerability to, danger from private violence.'"  *T.D. v. Patton*, 868 F.3d 1209, 1221-22 (10th Cir. 2017) (quoting *Currier v. Doran*,

---

[1] In Plaintiffs' Response, they state that they "do not intend to waive special relationship arguments on first impression."  (Resp. at 23.)  However, Plaintiffs did not assert a Due Process Claim based on the special relationship doctrine in their Second Amended Complaint.

242 F.3d 905, 923 (10th Cir. 2001)). In *Patton*, the Tenth Circuit recently summarized the requirements for a plaintiff to establish a claim under the danger-creation theory:

> To invoke the danger-creation theory, a plaintiff must show a state actor "affirmatively act[ed] to create or increase a plaintiff's vulnerability to, danger from private violence." *Currier*, 242 F.3d at 923; *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). If a plaintiff meets those preconditions, a plaintiff must next demonstrate:
>
> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking. *Currier*, 242 F.3d at 918 [].
>
> On the final element-whether the conduct is conscience shocking-neither ordinary negligence nor permitting unreasonable risks qualifies as conscience shocking. *Ruiz*, 299 F.3d at 1184. "Rather, a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (quotations omitted).

*Patton*, 868 F.3d at 1222. Thus, prior to considering the six listed elements, a court must first determine whether a plaintiff has sufficiently alleged the "necessary precondition" that the defendant took "affirmative acts" to create or increase the plaintiff's danger. *Id.* at 1226. Defendant Dolan argues Plaintiffs' allegations do not satisfy this precondition and therefore, the claim must be dismissed.

The "state created danger" doctrine emanates from language in *DeShaney, supra*. There, the county Department of Social Services ("DSS") and several of its social workers received complaints that a child, Joshua, was being abused by his father. The caseworker assigned to Joshua recorded her observations in her files, along with her continuing suspicions that someone

in the DeShaney household was physically abusing Joshua, but she did nothing more. *Id.* at 193.

The caseworker was later notified Joshua had been treated again for injuries that appeared to

have been the result of child abuse. She made two visits to the DeShaney household, but was

informed Joshua was too ill to see her and the department again took no action. *Id.* Joshua was

eventually beaten so badly he suffered permanent brain damage and was rendered profoundly

mentally disabled. *Id.*

Joshua and his mother brought an action under 42 U.S.C. § 1983 against the county, DSS,

and various individual employees of the department. The Complaint alleged that respondents

"had deprived Joshua of his liberty without due process of law, in violation of his rights under

the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his

father's hands of which they knew or should have known." *Id.* The district court granted

summary judgment for defendants, and the Court of Appeals affirmed, holding that petitioners

had failed to state an actionable § 1983 claim. The United States Supreme Court granted

certiorari to determine when, if ever, the failure of a local governmental entity or its agents to

provide an individual with adequate protective services constitutes a violation of the individual's

due process rights. *Id.* at 194.

The Court concluded that because the harms Joshua suffered did not occur while he was

in the State's custody, but occurred while he was in the custody of his natural father, who was

not a state actor, his claim could not succeed. *Id.* at 201. The Court further explained:

> While the State may have been aware of the dangers that Joshua faced in the free
> world, *it played no part in their creation, nor did it do anything to render him any
> more vulnerable to them.* That the State once took temporary custody of Joshua
> does not alter the analysis, for when it returned him to his father's custody, it
> placed him in no worse position than that in which he would have been had it not
> acted at all; the State does not become the permanent guarantor of an individual's

> safety by having once offered him shelter.  Under these circumstances, the State
> had no constitutional duty to protect Joshua.

*Id.* (emphasis provided).

The state-created danger doctrine has become a staple of constitutional law and the Tenth Circuit has consistently adhered to the Supreme Court's pronouncements in *DeShaney*.  For example, in *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008), the Tenth Circuit affirmed the dismissal of a danger creation claim against the Oklahoma Department of Human Services stating, "The mere fail[ure] to take steps to ensure that Renee was placed in a safe environment is insufficient as a matter of law to result in liability."  *Id.* at 1251-52.  In *Estate of B.I.C. v. Gillen*, 761 F.3d 1099 (10th Cir. 2014), the estate of a child, Brook, who had been fatally injured by her father's girlfriend, argued that "six purported affirmative actions [on the part of the defendant social worker] increased Brook's vulnerability to danger," including refusing to accept pictures from Brook's grandparents of her injuries, refusing to return phone calls from the police, refusing to substantiate abuse that caused a large red mark on the face of her brother who also lived in the home, telling Brook's grandparents to contact the police about increased bruising on the children, telling Brook's grandparents that any abuse of the children was not her issue, and lying about whether she had been in the home to investigate the reported abuse against Brook's brother.  *Id.* at 1105.  The court held these acts were not sufficient to satisfy the 'affirmative act' requirement of the state created danger theory because the social worker did not place Brook in her father's home and thus, did nothing to increase her vulnerability to danger.  *Id.* at 1105-08.

In their Response, Plaintiffs rely on *Patton* indicating the Tenth Circuit decision is adverse to Defendant's position in this matter.  (Resp. at 16, 20-21.)  However, *Patton* is distinguishable from the present case and illustrates Plaintiffs' due process claim against

Defendant is not viable. In *Patton*, T.D., a 14 year old male, was living with his mother, Regina

Garcia. *Patton*, 868 F.3d at 1214. T.D.'s father, Tiercel Duerson, did not live in the home. *Id.*

In November 2009, based on notifications to and observations by the Department of Human

Services ("DHS"), a social worker removed T.D. from his mother's home and placed him at the

"Family Crisis Center." *Id.* Following DHS's filing of a "Petition in Dependency of Neglect,"

DHS assigned Defendant Patton as the caseworker. *Id.* Defendant Patton was aware Mr.

Duerson, T.D.'s father, was a registered sex offender resulting from a conviction of attempted

sexual assault of a minor arising from his attempt to sodomize his minor stepdaughter. *Id.* at

1214-15.

Prior to one of the juvenile court hearings related to T.D. and his placement, Defendant

Patton submitted a report to the court omitting several material facts of which she was aware,

including but not limited to, Mr. Duerson's criminal history, details of Mr. Duerson's sexual

assault of a minor conviction, his failure to fulfill his sex offender treatment, or the multiple

other incidents of sexual abuse not resulting in conviction. *Id.* At the hearing, Defendant Patton

recommended T.D.'s transfer to Mr. Duerson's custody and the juvenile court agreed. *Id.* at

1216-17.

Prior to the next hearing in June 2011, following T.D.'s placement in Mr. Duerson's

custody, Defendant Patton had concerns regarding T.D.'s safety in his father's home. *Id.* at

1218. She did not report those concerns to the court because her supervisor told her T.D. would

remain in Mr. Duerson's custody and Defendant Patton was concerned she would be fired if she

recommended his removal. *Id.* At an August 2011 hearing, Defendant Patton falsely reported to

the court that she had made monthly visits to the Duerson home and she recommended T.D. stay in Mr. Duerson's custody. *Id.*

In September 2011, DHS received a report of sexual contact between T.D. and his half-brother and he was removed from the home. *Id.* Ultimately, it was revealed that Mr. Duerson had repeatedly and severely sexually assaulted T.D. in multiple scenarios both alone and involving T.D.'s three year old half-brother. *Id.* at 1219.

T.D.'s mother brought suit against Defendant Patton and DHS on T.D.'s behalf alleging they violated his substantive due process rights under the Fourteenth Amendment based on a danger-creation theory and a special relationship theory. *Id.* The district court denied summary judgment to Defendant Patton on the danger-creation theory and she appealed. *Id.* The Tenth Circuit affirmed. *Id.* at 1225, 1236.

In its opinion, the court explained, "To invoke the danger-creation theory, a plaintiff must show a state actor 'affirmatively act[ed] to create, or increase a plaintiff's vulnerability to, danger from private violence.'" *Id.* at 1222 (quoting *Currier*, 242 F.3d at 923). The Tenth Circuit noted that in *Currier* it had previously held that *Deshaney* did not bar a claim under the danger-creation theory if the child in question would not have been exposed to the injury causing dangers "'*but for the affirmative acts of the state.*'" *Id.* at 1223-24 (emphasis in original) (quoting *Currier*, 242 F.3d at 918-19). "The court wrote: 'When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, DeShaney does not foreclose constitutional liability.'" *Id.* at 1224 (quoting *Currier*, 242 F.3d at 919). Applying *Currier*, the court concluded the district court correctly denied Defendant Patton summary judgment because her "affirmative conduct" in participating in the removal of T.D. from his mother's home and

placing him in his father's, while intentionally withholding information throughout the process, created the danger that resulted in harm. *Id.* at 1226.

The court also noted Ms. Patton's affirmative conduct following T.D.'s initial placement with his father. *Id.* In *Deshaney*, in ruling that the State of Wisconsin could not be held liable for the harm inflicted on Joshua Deshaney, the court reasoned, "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Deshaney*, 489 U.S. at 203. By contrast, Defendant Patton acted affirmatively post-placement by continuing to recommend to the court that T.D. remain in his father's custody, two of those recommendations in the face of having received information that Mr. Duerson was abusing T.D. *Patton*, 868 F.3d at 1226.

The present case is similar to *Deshaney* rather than *Patton*. Plaintiffs' allegations and theory of liability is that Defendant Dolan should have recognized Defendant Madera was not adequately working her case files and therefore, taken a far more active role in supervising her and monitoring her cases. Additionally, after reviewing Natalee's file, Defendant Dolan should have known Natalee was in a high risk household and therefore, assigned her to a different team specifically designed to handle such cases. Presuming Plaintiffs' allegations are true and accurate and drawing all inferences in their favor, Plaintiffs' claim still fails. They do not allege Defendant Dolan took any affirmative actions affecting Natalee's placement and thus, for purposes of due process analysis, she did nothing to *increase* Natalee's danger. *Deshaney*, 489 U.S. at 201; *Patton*, 868 F.3d at 1223-24. While Defendant Dolan may have or should have been aware of the level of Natalee's vulnerability, she "played no part in [its] creation, nor did [she] do anything to render [Natalee] any more vulnerable to [it]." *Id.* Defendant Dolan did not place

Natalee in her mother's home and thus, did nothing to increase her vulnerability. *Gillen*, 761 F.3d at 1105-08. As in *Deshaney*, the most that can be said of Defendant Dolan is that she stood by and did nothing when suspicious circumstances dictated a more active role. *Deshaney*, 489 U.S. at 203.

As noted in *Deshaney*, while "[t]he people of [Colorado] may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one," constitutional law is well established that inaction on the part of the state does not provide the basis for a due process claim. *Deshaney*, 489 U.S. at 203. Accordingly, Plaintiffs' due process claim based upon the danger creation theory must be dismissed.

**3. Failure to Supervise**

Plaintiffs also assert a due process claim against Defendant Dolan based on a theory of failure to supervise Defendant Madera. However, a failure to supervise claim depends upon a constitutional violation committed by a subordinate. *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909 (10th Cir. 2012). The Tenth Circuit's decision in *Gray* is instructive here. The *Gray* court embarked on a thorough review of the state-created danger theory, beginning with the theory's inception in *DeShaney*. As part of this review, *Gray* directly addressed the constitutional implications of the state-created danger theory and a supervisor's failure to supervise.

> As an alternative to our holding in *Sutton* that [a school] principal on the facts alleged could not be liable for his "direct participation in enhancing the danger" to the child, we held the principal could be liable on those same facts for his inaction in failing "to adequately train school employees or adopt or implement a policy to prevent sexual assaults like those against [the child]." *Sutton [v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1238-39 (10th Cir. 1999)]. This approach to

the principal's accountability might well have succeeded under a theory of supervisory liability, if the mother first was able to establish an underlying constitutional violation on the part of the teacher's aide or other state actor. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 [] (1986) (per curiam) (holding that if a police officer inflicted no constitutional injury on a suspect, "it is inconceivable" that the police commissioners could be liable to the suspect); *Morris v. Lanpher*, 563 F.3d 399, 403 (8th Cir. 2009) (recognizing that without an underlying constitutional violation, a § 1983 claim for failure to supervise "necessarily fails"); *see also Currier,* [242 F.3d at 922-23] (relying on *Sutton* to uphold a claim for failure to supervise against a child welfare supervisor as part of a complaint that also adequately alleged an underlying constitutional violation against subordinate social workers based on danger creation); *cf. Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009) (holding a sheriff could not be liable for implementing county policies where no underlying violation of decedent's rights had occurred). We believe *Sutton* recognized the requirement that supervisory liability be premised on an underlying constitutional violation. . . . *DeShaney* told us that absent a custodial relationship, a State's failure to protect a child from private violence does not violate the Due Process Clause. *DeShaney*, 489 U.S. at 197[]. And *Graham* told us that the "state-created danger doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger," and that "inaction by the state in the face of a known danger is not enough" to invoke the protections of the Due Process Clause. *Graham*, 22 F.3d at 995 . . . .

*Gray*, 672 F.3d at 918 n.7. *See also Casillas v. Beach,* No. 08–cv–02327–WYD–CBS, 2010 WL 1348397, at *6 (D. Colo. 2010) (dismissing failure to supervise claim where the plaintiff failed to sufficiently allege an underlying constitutional violation by an employee); *Bunner v. Koch*, No. 08–cv–00171–WYD–KLM, 2009 WL 798550, at *16 (D. Colo. Jan. 30, 2009) (recognizing that a failure to supervise claim "does not exist independent from the alleged underlying constitutional violation upon which Plaintiff seeks to impose supervisor liability.")

Thus, a failure to supervise claim inherently relies on Plaintiffs sufficiently alleging that Defendant Madera's actions constituted a due process violation. In this regard, Plaintiffs allege that not only did Defendant Madera fail to carry out her responsibilities with regard to Natalee, she created false reports in TRAILS indicating she had visited Natalee and her mother at the

hospital, visited Natalee's home, interviewed Natalee's parents, and observed and interviewed the other children in the home. (Am. Comp. at 10-13, 16-18.) She falsely documented Natalee's Meconium test results as negative and completed documentation inaccurately pertaining to risk factors to which Natalee was exposed, resulting in an assignment of a Moderate Risk, instead of High Risk, household. (*Id.* at 10, 12-13, 16, 42-43, 74-75, 82, 90.) A High Risk classification would have led to Natalee's assignment to a team specifically designed for High Risk case files. (*Id.*)

Defendant Madera's failure to carry out her responsibilities regarding visiting, observing and interviewing Natalee, her parents, and their household are all failures to act. These failures did not change the status quo. Like *Deshaney* and *Gillen*, Defendant Madera "did not place [Natalee] with [her mother], so she had no duty to rescue her from that custody." *Gillen*, 761 F.3d at 1107.

Similarly, Defendant Madera's false and/or inaccurate reporting and documentation throughout Natalee's file is likewise not a clearly established constitutional violation. Plaintiffs may intend to predicate liability on these actions as misrepresentations that causes others to lower their guard and not seek protection by other means. However, the Tenth Circuit has specifically rejected that theory of liability. *See Gillen*, 761 F.3d at 1108 (relying on *Gray* to hold that a social worker's misrepresentation and/or false report that she visited a child's home who was later killed by her caretaker was not "affirmative conduct sufficient to invoke the state-created danger theory of constitutional liability.").

As noted in *Gray*, an approach to Defendant Dolan's accountability might well have succeeded under a theory of supervisory liability if Plaintiffs were able to establish an underlying

constitutional violation on the part of Defendant Madera. *Id.* at 918 n.7. However, based upon the same reasoning set forth above regarding Defendant Dolan, *Deshaney* and its progeny dictate Plaintiffs' allegations do not support a due process claim against Defendant Madera. Accordingly, Plaintiffs' failure to supervise claim against Defendant Dolan must be dismissed.

## 4. State law claim – Willful and Wanton Conduct

The Colorado Governmental Immunity Act, Colo. Rev. Stat. § 24–10–101, *et seq.* (CGIA), covers "all the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort." *Id.* at § 102. The term "public entity" is defined as "the state, county, city and county, municipality, school district . . . and every other kind of district, agency, instrumentality, or political subdivision thereof organized pursuant to law." *Id.* at § 103(5). "Public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity." *Id.* at § 103(4). There is no dispute Defendant Dolan is a public employee under the CGIA.

A public employee may only be held liable for conduct that is willful and wanton:

[a] public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing injury was willful and wanton.

*Id.* at § 118(2)(a).

In *Moody v. Ungerer*, 885 P.2d 200 (Colo. 1994), after noting that "willful and wanton" is not defined by the CGIA, the Colorado Supreme Court recited the following definitions of the phrase:

Section 13–21–102(1)(b) defines 'willful and wanton' for purposes of determining exemplary damages:

As used in this section, 'willful and wanton' conduct means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

In *Pettingell v. Moede*, [] 271 P.2d 1038, 1042 (1954), we defined 'willful and wanton' as [] 'wholly disregardful of the rights, feelings and safety of others . . . at times even imply[ing] an element of evil.' *See also* Blacks Law Dictionary 1434-35 (5th ed. 1979) ('In order to constitute 'willful and wanton' misconduct, act or omission must be not only negligent, but exhibit conscious disregard for safety of others.').

*Id.* at 205. *See also Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1141 (D. Colo. 2001) (construing "controlling Colorado court authority to mean that for a defendant's conduct to be "willful and wanton" under the CGIA that defendant must be adequately alleged to have purposefully pursued a course of action or inaction that he or she considered would probably result in the harm to Plaintiffs.")

In the present case, Defendant Dolan's alleged actions and/or inactions, detailed above, indicate there was more she could have done in supervising Defendant Madera. However, the court finds these actions or omissions, while possibly negligent and perhaps even grossly negligent, do not constitute willful and wanton conduct sufficient to abrogate governmental immunity under Colorado law.

Accordingly, it is

**ORDERED** that "Defendant Dolan's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" (Doc. No. 66) is **GRANTED** in its entirety.

Dated this 2nd day of February, 2018.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge